1
2
3
4
5
6
7
8        **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA**

10

11   DWIGHT SHELTON,                    ) Case No. CV 13-7531-JPR
                                        )
12                    Petitioner,       )
                                        ) MEMORANDUM OPINION AND ORDER
13            vs.                       ) DENYING FIRST AMENDED PETITION
                                        ) AND DISMISSING ACTION WITH
14   DAVID B. LONG, Warden,[1]          ) PREJUDICE
                                        )
15                    Respondent.       )
     ───────────────────────────────   )
16

17                          **PROCEEDINGS**

18        On October 11, 2013, Petitioner filed a Petition for Writ of

19   Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C.

20   § 2254.  On October 18, 2013, the Court dismissed the Petition

21   with leave to amend for failure to name a proper respondent.  On

22   November 18, 2013, Petitioner filed an amended petition.  On May

23   20, 2014, Respondent filed an Answer and a memorandum of points

24   and authorities.  On July 28, 2014, Petitioner submitted an

25

26   ───────────────────────────
           [1] David B. Long, warden of California City Correctional
27   Facility, where Petitioner is housed, is substituted in under
     Federal Rule of Civil Procedure 25(d) as the sole respondent.  See
28   R. 2, Rs. Governing § 2254 Cases in U.S. Dist. Cts.

                                   1

"Election Regarding Consent to Proceed Before a United States Magistrate Judge" form, indicating that he voluntarily consented to "have a United States Magistrate Judge conduct all further proceedings in this case, decide all dispositive and non-dispositive matters, and order the entry of final judgment." Respondent had previously consented, on May 15, 2014. On September 15, 2014, Petitioner filed a Traverse.

For the reasons discussed below, the First Amended Petition is denied, Petitioner's request for an evidentiary hearing is denied, and this action is dismissed with prejudice.

**PETITIONER'S CLAIMS**

I.   The trial court committed misconduct by assuming the role of the prosecutor, violating Petitioner's rights to due process and a fair trial. (FAP at 5; Traverse at 3-8.)

II.   The trial court erroneously admitted evidence that Petitioner possessed false identification cards when he was arrested, violating his right to due process. (FAP at 5; Traverse at 8-10.)

III. Petitioner's sentence violated California Penal Code section 654's prohibition against multiple punishments. (FAP at 6, 24-25.)

**BACKGROUND**

On December 3, 2009, following a joint trial with codefendant Joseph Allen Little, Petitioner was convicted by a Los Angeles County Superior Court jury of nine counts of making a false financial statement, four counts of grand theft of personal property, two counts of attempted grand theft of personal property, 22 counts of forgery, 10 counts of offering a false or

forged instrument for recording, three counts of identity theft, and one count of conspiracy to commit a crime. (Lodged Doc. 1, 4 Clerk's Tr. at 846-96.)  On two of the grand-theft-of-personal-property counts, the jury found true an allegation that the loss was more than $150,000.  (Id. at 849, 865.)  The jury also found true an allegation that Petitioner committed two or more related felony offenses involving the taking of more than $500,000.  (Id. at 897.)  On January 29, 2010, the trial court sentenced Petitioner to 29 years four months in state prison.  (Id. at 978.)

Petitioner appealed, raising all three claims of the FAP, among others.  (Lodged Doc. 7.)  On April 10, 2012, the California Court of Appeal affirmed other than to correct some errors in the abstract of judgment.  (Lodged Doc. 12 at 42.) Petitioner filed a petition for review (Lodged Doc. 13); on June 27, 2012, the California Supreme Court summarily denied review (Lodged Doc. 15).

On December 5, 2012, Petitioner filed a habeas petition in the superior court.  (Lodged Doc. 16.)  Petitioner raised a federal version of ground three of the FAP and three new claims. (Id.)  On April 26, 2013, the court denied the petition as "clearly unmeritorious."  (Lodged Doc. 17 at 54-55.)

On September 10, 2013, Petitioner filed another habeas petition in the superior court, raising claims not in the FAP.[2]

---

[2] A copy of that petition has not been lodged with the Court. In the FAP, however, Petitioner states that he filed a habeas petition in the superior court on September 10, 2013, claiming that the trial court violated his Fifth, Sixth, and 14th amendment rights in sentencing him to the upper terms and failing to state

On September 25, 2013, the court denied the petition on the grounds that it was successive, its claims could have been but were not raised on direct appeal, and it was "unmeritorious." (Lodged Doc. 17 at 55.)  Petitioner never filed a habeas petition in the California Supreme Court.  (See Cal. Appellate Cts. Case Info. Website, Case No. B222428, http://appellatecases.courtinfo.ca.gov/ (last visited Jan. 26, 2015).)

### SUMMARY OF THE EVIDENCE

The factual summary in a state appellate-court opinion is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  See Thompson v. Runnels, 705 F.3d 1089, 1091-92 (9th Cir.), cert. denied, 134 S. Ct. 234 (2013); but see Murray v. Schriro, 745 F.3d 984, 1001 (9th Cir. 2014) (discussing "state of confusion" in circuit's law concerning interplay of § 2254(d)(2) and (e)(1)).  Because Petitioner does not challenge the sufficiency of the evidence, the Court adopts the following statement of facts from the California Court of Appeal opinion as a fair and accurate summary of the evidence presented at trial. The Court has nonetheless independently reviewed the state-court record.

    A.   Prosecution Evidence

        1.   Overview

The prosecution submitted evidence that [Petitioner

---

reasons for doing so.  (FAP at 8.)  Because Petitioner never filed a habeas petition in the California Supreme Court, see Cal. Appellate Cts. Case Info. Website, Case No. B222428, http://appellatecases.courtinfo.ca.gov/ (last visited Jan. 26, 2015), any such claims have not been exhausted, see Baldwin v. Reese, 541 U.S. 27, 29 (2004).

and Little], while operating a real estate business called "Freedom Forever Enterprises" (Freedom Forever), arranged several fraudulent real estate transactions. They jointly committed forgery and other crimes during five transactions involving properties on Tennessee Avenue in West Los Angeles, Acacia Avenue in Glendale, Breada Avenue in Murietta, Whitesprings Drive in Whittier, and North 140th Way in Scottsdale, Arizona (Arizona property); in addition, [Petitioner] committed forgery and other crimes during a sixth transaction involving a property on Formosa Avenue in West Hollywood. [Petitioner and Little] used fictitious or stolen identities to facilitate the transactions, and then stole, or attempted to steal, the sale proceeds. In connection with the Tennessee Avenue and Formosa Avenue properties, the purported buyer was a fictitious person named "Don Marsh"; in connection with the remaining properties, the purported buyer was Valerie Najera, whose identity [Petitioner and Little] had misappropriated. [Petitioner and Little] were assisted by Roderick Dunn, Harold McCrimmon, and employees of Sunset Capital Mortgage (Sunset Capital) and EZ Loans, some of whom admitted engaging in wrongful conduct.

2. <u>Background</u>

a. <u>Freedom Forever</u>

In early 2006, Merav Agig became [Petitioner's] girlfriend for several months. Petitioner asked her to become Chief Financial Officer (CFO) of Freedom Forever,

a company he had operated for 10 years.  Although Agig was unclear what a CFO did, she agreed.  She received no pay and had nothing to do with Freedom Forever's daily operations, but sometimes signed documents.  At some point, she and [Petitioner] opened a Bank of America account for Freedom Forever.  According to Agig, [Petitioner] sometimes relied on her credit rating to arrange transactions for his benefit.

In August 2006, Michele Smith met with [Petitioner and Little] at a restaurant, where Little explained that he wanted to hire an administrative assistant for his real estate business, which he identified as Freedom Forever.  Little introduced [Petitioner] as his business partner.  A few weeks later, Smith accepted an offer of employment from Little.  After Smith began her employment, Little told her that certain people would be contacting her regarding real estate transactions.  The people included Tonya Crawford, who worked for Sunset Capital, and Andrea Taylor, who worked at EZ Loans.  On the basis of e-mails from Vanessa Menjivar, who also worked at Sunset Capital, Smith compiled a list of real estate transactions that she monitored for Little.  The list included transactions involving Valerie Najera.  Smith also compiled a contact list based primarily on information from Little and Harold McCrimmon, who sent Smith e-mails.  Although Smith rarely talked to [Petitioner], she communicated regularly with Little in order to update him regarding the transactions on her

list.

[b]. <u>Don Marsh</u>

At some point, [Petitioner] persuaded Agig to join him in purchasing a house on Libbet Avenue in Encino. They agreed to buy the house, fix it up, "flip it," and share the profits from the sale. Although each contributed to the down payment on the house, the loan was obtained on the basis of Agig's credit. According to Agig, [Petitioner] reneged on his promises to her, and failed to fix up the house. Instead, he transferred the house to another owner, but left her responsible for the loan. Because she did not make the loan payments, the lending bank initiated foreclosure proceedings.

The prosecution submitted a bankruptcy petition filed on behalf of Don Marsh, which listed the Libbet Avenue property as his address. Agig knew of no such person living on the Libbet Avenue property. In addition, the prosecution submitted evidence that gas bills and credit card charges in the name of Don Marsh were paid through Freedom Forever's bank accounts.

[c]. <u>Valerie Najera</u>

In 2006, Lisa Blue provided credit repair services through an office operated by Ayinde Mitchell. While making a presentation regarding these services, Blue encountered Little. Blue had become acquainted with Little years earlier, but had not seen him for 10 years. Two or three weeks later, she dined with Little and [Petitioner] at a restaurant. Following this contact,

7

[Petitioner] asked Blue whether she knew of someone with good credit interested in helping him buy a property. [Petitioner] said the property was to be renovated for use by disabled persons and resold, and that he sought a "co-buyer or a co-owner" who would be paid from the venture's profits.

In July or August 2008, Valerie Najera met with Mitchell, seeking advice regarding starting a business. Mitchell suggested that Najera work as a "substitute buyer," and brought Najera to Blue's attention. Najera revisited Mitchell's office, talked to Blue, and signed a substitute buyer agreement. Under the agreement, Najera was to receive $8,000 in exchange for the use of her name in connection with the purchase of a house on Laurel Canyon; Najera was to act as the owner of the house for four months while it was renovated. According to Najera, she never agreed to act as a substitute buyer regarding any other property, and she never authorized anyone to place her signature on documents related to the purchase of other properties.

After Blue identified her own employer as [Petitioner], Najera talked to him by phone, but never met him. [Petitioner] arranged a meeting between Najera and Roderick Dunn, a notary, regarding the purchase of the Laurel Canyon property. When Najera signed Dunn's notary book, she noticed that the page upon which she placed her signature contained no information.

Najera testified that after this incident, she

8

talked to Blue, who told her that someone would be contacting her. She then received a call from Harold McCrimmon, asking for a copy of her bank statement so that he could arrange for the payment of her fee. After Najera provided the statement, she and Blue drove to a car dealership, where Blue obtained $4,000 for Najera.

Blue testified that after the incident involving Dunn, Najera expressed concerns regarding the Laurel Canyon property transaction. Blue tried unsuccessfully to contact [Petitioner], and then phoned Little. According to Blue, she told Little that "things weren't being done as [Najera] expected . . . based on the time frames and the information given [to] her." Little replied that he would look into the situation. Shortly thereafter, following Najera's receipt of some mortgage statements regarding properties of which she had no knowledge, Blue again contacted Little and described the statements. When Little said that he would investigate them, Blue told him, "'Whatever is going on . . . [t]his needs to stop.'" Little did not respond to Blue's inquiries. Instead, McCrimmon phoned Blue and told her to assure Najera that "everything [was] going to be okay." Shortly thereafter, Blue and Najera drove to the car dealership where McCrimmon gave Blue $4,000 for Najera.

In December 2006, McCrimmon told Blue that Najera could pick up the balance of her $8,000 fee at the Pacific Escrow Company. When Blue and Najera appeared at

9

the escrow company, someone referred to a fraud in connection with the Laurel Canyon property transaction, and Blue and Najera fled from the office. Najera left messages for [Petitioner] and McCrimmon that she refused to carry on with the transaction. She later learned that her signature had been forged on documents related to several real estate transactions.

### [d]. Roderick Dunn

Beginning in 2006, Dunn provided notary services at [Petitioner's] request on several occasions. [Petitioner] arranged for Dunn to meet with Najera and notarized her signature on some documents. Later, at [Petitioner]'s request, Dunn notarized signatures on documents related to other transactions, even though the purported signers were not present. According to Dunn, in December 2006, [Petitioner] seized his notary book and never returned it. Later, Dunn pleaded guilty to a charge of notary fraud.

### [e]. Harold McCrimmon

McCrimmon testified that he owned a phone store called "Digital Solutions" in San Diego. After he met [Petitioner and Little] in May 2006, they asked him to help process real estate files connected with Little's investment activities. Later, at [Petitioner]'s request, McCrimmon performed tasks related to the underlying real estate transactions. According to McCrimmon, at [Petitioner]'s direction, funds from the transactions were sometimes disbursed to McCrimmon or his business and

then relayed to other parties. At some point, [Petitioner] told McCrimmon that he split the funds from his real estate transactions with Little. McCrimmon pleaded guilty to a felony in connection with the underlying transactions.

### [f]. Sunset Capital

During the pertinent period, Tonya Crawford was a loan processor working at Sunset Capital, in which her brother held an ownership interest. Crawford's assistant was Vanessa Menjivar. In 2006, in the course of business, Crawford became acquainted with Little, who later introduced her to [Petitioner].

In August 2006, [Petitioner and Little] met with Crawford and Menjivar at Sunset Capital. [Petitioner and Little] said that [Petitioner] had several clients who wanted to "flip" properties, and that they intended to bring approximately five loans per month to Sunset Capital. Crawford and Menjivar provided [Petitioner and Little] packets of blank loan applications and related documents, and subsequently processed the documents that [Petitioner] submitted in connection with the six properties at issue. According to Crawford, [Petitioner] purported to act as the "consultant" for the buyer and the seller in connection with five of these transactions (Tennessee Avenue, Acacia Avenue, Breada Avenue, Whitesprings Drive, and Formosa Avenue); in addition, Menjivar testified that [Petitioner] said he represented Najera.

Crawford and Menjivar placed false information on the loan applications, and obtained falsified documents to facilitate the loans.  They arranged for fabricated documents concerning Najera's taxes and employment.  In addition, they acquired false verifications of rent for Najera and Don Marsh from Maryann Oliver, who worked for a real estate management company.  Later, Crawford and Menjivar each pleaded guilty to a felony in connection with the underlying transactions.

[g].  EZ Loans

In 2006, Sharon Thornton owned and operated EZ Loans.  Although [Petitioner] did not have an office at EZ Loans, he visited it once or twice a week, sat at a desk, and sometimes used its office computers.  According to notary Dunn, [Petitioner] described EZ Loans as "his office."  In addition, Little often visited EZ Loans and had a close relationship with Thornton, who was training Little's wife regarding the real estate business.

Thornton pleaded guilty to three felonies in connection with the underlying real estate transactions.  EZ Loans assisted Sunset Capital in processing loans related to at least seven transactions involving Najera.  When Taylor, a loan processor working at EZ Loans, asked Thornton why Najera was engaged in so many transactions, Thornton said that Najera "had come into some money" and was "flipping a lot of properties to make . . . a quick profit."  According to Taylor, on several occasions, Little discussed the progress of the Najera transactions

12

with her, and sometimes brought documents related to the transactions to EZ Loans; in addition, Taylor often talked to Woods, Little's assistant, regarding the transactions.[FN6]

> [FN6]     After Taylor ended her employment with EZ Loans, a detective investigating the underlying crimes contacted her.  When Taylor asked Thornton what was going on, Thornton urged her not to talk to the detective.  Later, Thornton arranged a meeting with Taylor that [Petitioner] also attended.  At the meeting, [Petitioner] also asked Taylor not to talk to the detective.

### 3.  Offenses

The prosecution presented evidence that [Petitioner and Little] conspired to commit grand theft exceeding $400, identity theft, the filing of false statements, forgery, and the offering of false or forged documents for filing (count 74).  This evidence was related to their conduct in connection with several real estate transactions.

#### a.  Tennessee Avenue Property (Counts 2, 3, 5, 6-11)

In 2006, Eugene Coldewe was in his late 80's and lived in a house on Tennessee Avenue that he had owned for over 20 years.  Coldewe never offered his house for

sale or authorized its sale.

Prior to August 1, 2006, Little phoned Anthony Sykes and asked him to appraise Coldewe's house. Sykes declined to do so unless he was paid in advance. Later, when [Petitioner and Little] met with Sykes, [Petitioner] stated that the appraisal was for him, rather than Little, and agreed to pay Sykes $500 in advance. According to Sykes, he never met Coldewe, and [Petitioner] never explained his authority to request the appraisal. In appraising Coldewe's house, Sykes entered the house through a rear door and took interior photographs. Sykes then provided his appraisal to Sunset Capital.

[Petitioner] provided loan documents regarding the property to Sunset Capital, which processed them. The documents named Don Marsh as the purchaser, and identified him as an officer of Freedom Forever; they also attributed to him a driver's license number and bank account number that belonged to other people. On September 15, 2006, Amerisource Escrow Inc. wired $685,000 into Freedom Forever's Bank of America account pursuant to escrow instructions bearing Coldewe's forged signature. Coldewe's signatures on other documents were also forged.

In September 2006, upon visiting Coldewe, Chrystal Arnold found documents mentioning an escrow involving Coldewe's house and a grant deed identifying the new owner as Don Marsh. Arnold sought legal advice on

14

Coldewe's behalf, and notified Mara Johnson, Coldewe's guardian and care giver.

### b. Acacia Avenue (Counts 13-21, 53)

In 2006, Clemente Camacho owned the Acacia Avenue property, and never authorized its sale. In September 2006, [Petitioner] sought an appraisal of the property from Ronald Robbins, who received additional information regarding the appraisal from Sunset Mortgage. [Petitioner] told Robbins that he probably could not get access to the property due to a pending divorce. In compiling the appraisal, Robbins used interior photographs of a different house. [Petitioner] paid $500 to Robbins, who submitted the appraisal to Sunset Mortgage.

[Petitioner] provided a loan application regarding the property that included Najera's forged signature. The application falsely represented that Najera worked for the Joshua Management Group, an accounting firm that occasionally provided financial services to [Petitioner and Little]. During the transaction, a grant deed for the property was prepared bearing Camacho's signature. Dunn testified that he notarized the deed after someone claiming to be Camacho signed the deed. At trial, Camacho denied executing any sale documents purporting to bear his signature.

When escrow closed, the escrow company was instructed to forward the sales proceeds to Sunset Capital. Pursuant to these instructions, the escrow

15

company sent a $554,589.74 check for Camacho to Sunset Capital.  On November 29, 2006, [Petitioner] picked up the check at Sunset Capital.

In late 2006, Camacho received a letter from his mortgage holder acknowledging a request for a change of address.  As Camacho had made no such request, he phoned the mortgage holder and discovered that his mortgage balance was listed as "zero" due to a sale of his house.  At Camacho's request, payment was stopped on the $554,589.74 check.

> c.   Breada Avenue (Counts 27, 29, 31, 33-35, 38-39, 42-43, 49)

In September 2006, Jorge and Patricia Hernandez decided to sell their property on Breada Avenue.  Jorge told several loan officers and brokers he knew, including McCrimmon.  McCrimmon replied that he knew of someone interested in the property.  Shortly afterward, Jorge received a purchase agreement by mail identifying Najera as the potential buyer.  Jorge never met Najera, and instead communicated through McCrimmon. The Hernandezes accepted Najera's purported offer and opened escrow.

Najera's signatures on the documents related to the transaction were forged, and false information for her was used in connection with the loan application.  At [Petitioner's] request, Dunn notarized several documents that displayed Patricia Hernandez's purported signature, even though she was not present. After escrow closed in October 2006, the escrow company was instructed to pay

16

out $45,000 of the sale proceeds to McCrimmon's business, Digital Solutions, and to redirect a $2,719.86 refund for Najera to Sunset Capital.   According to McCrimmon, he received only $2,500 of the $45,000 as a referral fee; at [Petitioner's] direction, he gave $37,500 to [Petitioner] and $5,000 to Blue.

### d.   Arizona Property (Counts 54-57)

In December 2006, Joseph Carr and his wife listed their property in Scottsdale, Arizona for sale through real estate agent Eric Saul.   After [Petitioner] contacted Saul's office, the property was purportedly sold to Najera for $1.25 million.   A document bearing Carr's forged signature assigned $275,000 of the proceeds to McCrimmon's business, Digital Solutions.   Escrow regarding the transaction never closed because Saul's office was unable to contact Najera.

### e.   Whitesprings Drive (Counts 50, 60-64)

In or after June 2006, Little invited Aaron Joshua, who owned the Joshua Management Group, to hold some funds from a real estate transaction in his business's trust account.   According to Joshua, although he expressed interest and provided [Petitioner and Little] with account information, the transaction he discussed with Little never transpired.

Later, documents containing Najera's forged signature were used to buy the Whitesprings Drive property, which was owned by Maryann Mariano.   Dunn

17

notarized Mariano's purported signature on the grant deed. The payoff demand requested that the check for the sales proceeds be sent to Joshua Management Group's bank account. Joshua testified that he never agreed to participate in the transaction and did not authorize the transfer.

When the escrow company responsible for the transaction was instructed to send the funds to the Joshua Management Group, it asked that Mariano come to its offices and personally authorize the transfer. Because Mariano did not do so, the escrow company declined to release the funds. According to the escrow officer who managed the transaction, a man also phoned and asked that the funds be wired to the Joshua Management Group account. The officer rejected the request, and the funds were never disbursed.

### f.   Formosa Avenue (Counts 67–73)

In 2006, Otis L. Banks decided to sell his house on Formosa Avenue. Banks was a friend of Thornton, who owned EZ Loans, and was listed as a vice president of EZ Loans. Banks advertised the sale by fliers, one of which was displayed at EZ Loans. On one of the occasions [Petitioner and Little] visited EZ Loans, [Petitioner] noticed the flier and asked Thornton questions regarding it. Later, Banks sold the house to Don Marsh through an agent. According to Banks, he never met Marsh.

[Petitioner] submitted Don Marsh's loan application to Sunset Capital. In processing the application,

Crawford purported to verify the false information on the application regarding Marsh. During the transaction, Little and a man who identified himself as Marsh appeared before Jeffrey Johnson, who notarized Marsh's signature on the trust deed. Little paid for the notary services. Upon the close of escrow, $60,000 from the sales proceeds was wired to Freedom Forever.

In June or July 2006, Kimberley Wesley and her children moved into the residence on the property. Wesley was Little's girlfriend, and had four children with him, including her oldest son, Jonathan Little. Wesley later told investigating officers that at [Petitioner's] direction, she paid monthly rent to someone she knew as Ann for approximately six months, after which she stopped paying rent.[FN9] Later, foreclosure proceedings began regarding the property. Wesley's family continued to live on the property without paying rent until they were evicted in October 2009.

> [FN9]  At trial, Wesley denied knowing [Petitioner].

### 4. Events Surrounding [Petitioner's and Little's] Arrests

In February and March 2007, Little deposited checks totaling $60,000 in the checking account of his girlfriend, Courtney Thomas. After each deposit, at Little's request, Thomas withdrew the funds at the maximum daily rate permitted by her bank and gave the funds to Little.

19

On November 16, 2007, investigating officers arrested Little, who had been driving a SUV. Inside the SUV, the officers found checks and deposit slips for Thomas's bank account, business cards for the Joshua Group, and a handwritten note referring to the Laurel Canyon property for which Najera had acted as "substitute buyer." In addition, they found identification cards for "Dave Quinn" bearing Little's photograph.

On November 8, 2008, during a police interview, [Petitioner] described himself as an unlicensed real estate "networker" who received 10 to 20 percent of the proceeds from transactions. When asked why people would pay such a fee for services that licensed brokers perform for a 3 to 6 percent commission, [Petitioner] replied that the people he used were "very, very fast," and added, "I don't understand the motivation behind the sellers." Upon viewing a chart depicting the persons involved in the underlying transactions, [Petitioner] described McCrimmon as a friend who handled financing, Blue as a person who had introduced him to potential buyers, Najera as one such buyer, Crawford as a "very fast" loan processor, and Joshua as a former business partner who performed accounting services for him. In connection with the Acacia Avenue property transaction, [Petitioner] said that he had brought the buyer to the seller, but maintained that Camacho's picture on the chart did not resemble the person he knew as Camacho. Furthermore, in connection with Najera's bank statement,

20

which had been altered to reflect a higher balance, [Petitioner] remarked that it was a common practice for borrowers to inflate their financial resources. He denied any knowledge whether Najera had been paid for the use of her identity in connection with the real estate transactions.

B.   [Petitioner's] Defense Evidence

[Petitioner] testified that since 2000, he had participated in many real estate transactions. [Petitioner] asserted that he alone opened Freedom Forever's Bank of America account in 2005. According to [Petitioner], Agig was the sole purchaser of the Libbet Avenue property; he acted only as a "facilitator" in the transaction. He also denied using Agig's credit to obtain items for his own benefit.

With respect to the underlying transactions, [Petitioner] denied that he engaged in fraudulent conduct or knowingly provided false information to anyone. According to [Petitioner], Don Marsh was a real person he had met several times. [Petitioner] denied that he identified Marsh as an officer of Freedom Forever, or that he submitted the bankruptcy petition for Marsh listing the Libbet Avenue property as Marsh's address. His sole conduct regarding Blue and Najera was to refer Blue to McCrimmon when she said that she had located substitute buyers. [Petitioner] further testified that neither he nor Little received blank loan documents when they visited Sunset Capital in August 2006. He denied

21

that he sent e-mails to Crawford, Menjivar, and Woods, that he hired Dunn to provide notary services regarding the underlying transactions, and that he possessed false identification cards when he was arrested.[FN10]

> [FN10]   [Petitioner] also denied that he asked Taylor not to speak with the police.

Regarding the Tennessee Avenue transaction, [Petitioner] testified he represented only Marsh, and never met Coldewe. He submitted no documents related to the transaction to Sunset Capital, and did not hire Sykes to appraise the property. According to [Petitioner], Marsh asked him to assign the transaction proceeds to Freedom Forever for further distribution. After Freedom Forever received the funds, pursuant to [Petitioner]'s agreement with Marsh, [Petitioner] withheld his fee and issued the balance to Marsh and Coldewe.

Regarding the Acacia Avenue transaction, [Petitioner] testified that his sole act was to refer a phone call from someone purporting to represent Najera to McCrimmon. He denied any other involvement or conduct in connection with the transaction. Similarly, regarding the Arizona transaction, [Petitioner] testified that his only act was to phone Saul and inquire regarding the property. Regarding the other transactions, [Petitioner] denied that he obtained funds from the Breada Avenue transaction, that he asked the escrow company responsible for the Whitesprings Drive transaction to send funds to

22

the Joshua Management Group, and that he arranged for Wesley and her family to live on the Formosa Avenue property.

C.   Little's Defense Evidence

On June 19, 2007, Glendale Police Department Detective Robert Zaun conducted a brief interview of Blue, who was not charged in the underlying case.  Blue told Zaun that [Petitioner] asked her to find people with good credit "to purchase properties and flip properties along with him and his company Freedom Forever," but did not mention Little.  Later, after an arrest warrant was issued for Blue, she was informed by phone that if she appeared for an interview, she would not be placed in custody and would be free to leave after the interview, regardless of what she said.  On September 18, 2008, Zaun and the prosecutor interviewed Blue.  Blue mentioned that she met Little before [Petitioner] asked her to find co-buyers, but otherwise described no contacts with Little.  An audiorecording of the interview was played for the jury.

On December 6, 2007, Zaun and the prosecutor interviewed Taylor, who also was never charged in the case.  During the interview, Zaun told Taylor that although she was a potential suspect, her statements would not be used against her.  Taylor stated that [Petitioner] and Thornton instructed her to work on the loans involving Najera, but never mentioned that Little monitored the loans.[FN11]

23

[FN11]     Zaun further testified that because Crawford, Menjivar, and McCrimmon agreed to testify at trial, some of the charges against them were dismissed; that he never found any records of phone calls between Smith and Little or e-mails from Smith to Little; and that neither Joshua nor Sykes was charged in the case.

D.    <u>Rebuttal</u>

Detective Zaun testified that he obtained [Petitioner's] photograph from the California Department of Motor Vehicles.  The photograph was admitted, together with copies of some identification cards and driver's licenses that [Petitioner] denied possessing when he was arrested.

(Lodged Doc. 12 at 4-19 (some footnotes omitted).)

**STANDARD OF REVIEW**

Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

24

States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under AEDPA, the "clearly established Federal law" that controls federal habeas review consists of holdings of Supreme Court cases "as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000).

Although a particular state-court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. Id. at 391, 412-13. A state-court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts governing Supreme Court law or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537 U.S. 3, 8 (2002). A state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Id.

State-court decisions that are not "contrary to" Supreme Court law may be set aside on federal habeas review only "if they are not merely erroneous, but 'an unreasonable application' of clearly established federal law, or based on 'an unreasonable determination of the facts' (emphasis added)." Id. at 11 (quoting § 2254(d)). A state-court decision that correctly identifies the governing legal rule may be rejected if it unreasonably applies the rule to the facts of a particular case. Williams, 529 U.S. at 407-08. To obtain federal habeas relief for such an "unreasonable application," however, a petitioner

25

must show that the state court's application of Supreme Court law was "objectively unreasonable." Id. at 409-10. In other words, habeas relief is warranted only if the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 131 S. Ct. 770, 786-87 (2011).

Here, Petitioner raised all three claims in the FAP on direct appeal. (Lodged Doc. 7.) The court of appeal rejected them on the merits, although it did not specifically address Petitioner's federal constitutional claims. (Lodged Doc. 12 at 26-41.) The supreme court summarily denied the petition for review. (Lodged Doc. 15.) AEDPA deference therefore applies. See Johnson v. Williams, 133 S. Ct. 1088, 1091-92 (2013) (holding that when petitioner fails to rebut presumption that federal claim has been adjudicated on merits, "the restrictive standard of review set out in § 2254(d)(2) consequently applies"). Because no reasoned state-court decision exists as to the federal constitutional aspects of the claims, the Court conducts an independent review of the record to determine whether the state court was objectively unreasonable in applying controlling federal law. See Haney v. Adams, 641 F.3d 1168, 1171 (9th Cir. 2011) (holding that independent review "is not de novo review of the constitutional issue, but only a means to determine whether the state court decision is objectively unreasonable" (internal quotation marks omitted)); see also Richter, 131 S. Ct. at 784, 786 (holding that "petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny

26

relief," and reviewing court "must determine what arguments or theories supported or . . . could have supported[] the state court's decision[,] and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]").

**DISCUSSION**

**I.    Petitioner's Judicial-Misconduct Claim Does Not Warrant Habeas Relief**

In ground one, Petitioner claims that the trial court committed misconduct, violating his rights to due process and a fair trial. (FAP at 5, 11-20; Traverse at 3-8.)  Specifically, he alleges that the trial judge stepped into the role of the prosecutor by engaging in adversarial questioning. (FAP at 18-19.)[3]  He claims that he was prejudiced by the trial court's "continuous and incessant interference with the proceedings." (Traverse at 6.)

A.   <u>Relevant Background</u>

At trial, not long after the start of direct examination of the prosecution's first witness, Detective Zaun, the trial court

---

[3]  In the Traverse, he adds that the "judicial interference" began at a pretrial hearing, at which the trial court suggested that the prosecutor file an amended information (Traverse at 4-5) — a claim the court of appeal refused to consider because he forfeited it by not objecting at the time (Lodged Doc. 12 at 30). Because the claim concerning amendment of the information is procedurally barred and was raised for the first time in the Traverse, the Court does not consider it.  <u>See Delgadillo v. Woodford</u>, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (holding that reply not proper pleading to raise additional grounds for relief or amend petition); <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 507 (9th Cir. 1994) (same).

1  called the parties to sidebar and told the prosecutor that he was
2  "starting with the wrong witness." (Lodged Doc. 5, 2 Rep.'s Tr.
3  at 332.) After the sidebar conference, the trial court
4  summarized the detective's testimony for the jury, saying, "So
5  basically, Detective, you executed search warrants and obtained
6  documents that you perceived might be related to this case; is
7  that basically it?" (Id. at 333.) When Detective Zaun answered
8  yes, the court stated, "I think that's sufficient for your
9  purpose," addressing the prosecutor. (Id.) The prosecutor then
10 called his next witness. (Id.)

11     During both direct and cross-examination of the
12 prosecution's next several witnesses, the trial court continued
13 in a similar manner. The court limited examination, saying
14 "that's sufficient" (id. at 338, 339), "that's enough" (id. at
15 339), and "let's move on" (id. at 337, 345-46). The court asked
16 questions of the witnesses (id. at 350-53, 362-63, 366, 372-77)
17 and summarized their testimony (id. at 338, 350, 366). During
18 another sidebar conference, the court urged the prosecutor to
19 "have a better sense for where you're going with this" and to
20 focus his questions to elicit relevant testimony. (Id. at 347-
21 48.)

22     After a recess, at a conference outside the jury's presence,
23 Petitioner's counsel stated that he was concerned "the court
24 ha[d] been taking over the questioning on a lot of what's going
25 on" and that its examination of the witnesses was "beginning to
26 give the impression that the court [was] the prosecutor." (Id.
27 at 378.) The court replied:

28          Well, I certainly don't want to give that

1    impression.  I do want to exercise the proper authority

2    under Evidence Code section 765[4] . . . .

3         My concern is that [the prosecutor] has not . . .

4    demonstrated effectively to the court that he has a way

5    to cut this case down to the essence of the case.  I

6    thought his opening statement was extremely confusing,

7    and I think that's something you commented on in opening

8    statement.  My only interest is in the truth.  If there

9    is fraud here, I want the jury to know about it.  If

10   there is not fraud, I want the jury to know that

11   too . . . .

12        . . . .

13        . . . I want to kind of cut through this and get to

14   what I feel are the important issues and that's why I

15   asked as many questions as I did.  I will try not to ask

16   questions, but where I feel we're bogging down, I will

17   jump in to try to move things alone, but my sole purpose

18   is to clarify issues for the truth.

19   (Id. at 378-79.)

20        During the remainder of the prosecution's case-in-chief, the

21   trial court directed questions to most of the witnesses,

22   including Agig, Najera, Woods, Blue, Dunn, Crawford, Menjivar,

23   McCrimmon, Joshua, and Thornton.  (See, e.g., id. at 402-03;

24   Lodged Doc. 5, 3 Rep.'s Tr. at 617-18, 716-17, 4 Rep.'s Tr. at

25

26        [4]  Section 765(a) provides:  "The court shall exercise
     reasonable control over the mode of interrogation of a witness so
27   as to make interrogation as rapid, as distinct, and as effective
     for the ascertainment of the truth, as may be, and to protect the
28   witness from undue harassment or embarrassment."

964-65, 1056-58, 1087, 5 Rep.'s Tr. at 1213-15, 1381-85, 6 Rep.'s Tr. at 1509-14, 1580-83.)  Many of the questions were foundational, background, or clarifying questions.  (See, e.g., Lodged Doc. 5, 3 Rep.'s Tr. at 617-18, 623, 629, 639-40, 703, 716, 722, 780, 4 Rep.'s Tr. at 904, 964, 5 Rep.'s Tr. at 1352, 1381-82, 6 Rep.'s Tr. at 1509, 1566, 1568, 1581.)  On several occasions, the court began questioning the witness because it apparently found his or her testimony confusing or superfluous, wanted to revisit a previous topic in greater detail, or sought to establish chronology.  (See, e.g., Lodged Doc. 5, 2 Rep.'s Tr. at 418, 3 Rep.'s Tr. at 625, 682, 4 Rep.'s Tr. at 974, 1056, 5 Rep.'s Tr. at 1314, 6 Rep.'s Tr. at 1509, 1514-16.)  The court also asked questions during cross-examination of the prosecution's witnesses, eliciting testimony favorable to Petitioner and Little.  (See, e.g., Lodged Doc. 5, 3 Rep.'s Tr. at 702-03, 707, 4 Rep.'s Tr. at 1020-21; see also Lodged Doc. 5, 7 Rep.'s Tr. at 2142.)  For example, during cross-examination of Najera, the following colloquy occurred:

> THE COURT:  And the point is, there was earlier testimony she's never met [Petitioner]; that is correct?
>
> THE WITNESS:  That's correct.
>
> THE COURT:  And so it would follow that he never personally in your presence asked you to do anything that you think is questionable behavior.  I mean, you never met him?
>
> THE WITNESS: I never met him.

(Lodged Doc. 5, 3 Rep.'s Tr. at 702-03.)  On at least one occasion, the trial court asked additional questions after all

30

counsel had concluded.  (<u>See, e.g.</u>, Lodged Doc. 5, 5 Rep.'s Tr.
at 1362-65.)

On several occasions, in the jury's presence, the court
admonished the prosecutor to present the case in chronological
order (Lodged Doc. 5, 2 Rep.'s Tr. at 399, 3 Rep.'s Tr. at 625, 4
Rep.'s Tr. at 976, 988, 998), remarked that the witness's
testimony was confusing or repetitive (Lodged Doc. 5, 2 Rep.'s
Tr. at 400, 5 Rep.'s Tr. at 1272, 1314, 6 Rep.'s Tr. at 1514), or
asked the prosecutor to "slow it down" (Lodged Doc. 5, 6 Rep.'s
Tr. at 1549, 1580).  On other occasions, the court tried to
expedite the trial by summarizing the witness's testimony as
elicited by the prosecutor (Lodged Doc. 5, 3 Rep.'s Tr. at 654,
676, 4 Rep.'s Tr. at 1036, 1041, 5 Rep.'s Tr. at 1261, 1338,
1358) or asking the prosecutor to "move on," "move it along,"
"keep moving," or "be quick" (<u>see, e.g.</u>, Lodged Doc. 5, 3 Rep.'s
Tr. at 645, 650-51, 655-57, 676-77, 679, 681, 694, 6 Rep.'s Tr.
at 1835).  The court also occasionally interrupted defense
counsel as well, saying, "All right," "[t]hat's the answer," and
"[s]o the answer is no."  (Lodged Doc. 5, 4 Rep.'s Tr. at 1017, 5
Rep.'s Tr. at 1304.)

During several conferences outside the jury's presence, the
court told the prosecutor that the jury could not follow his
"very confusing" presentation of the case, scolded him for
"jumping around," and urged him to "try to march through the
testimony" and "take it step by step," in chronological order.
(Lodged Doc. 5, 3 Rep.'s Tr. at 611, 4 Rep.'s Tr. at 1004-05,
1061.)

At sentencing, Petitioner's counsel moved for a new trial.

31

He stated that he was "concerned about what went on in the trial to the extent that maybe the jury felt sorry for the District Attorney in this case and that could have resulted in a verdict." (Id. at 3602-03.)  Petitioner's counsel was also concerned that in objecting "hundreds of times" during the prosecution's case-in-chief, he "ended up . . . alienating the jury by looking like [he was] trying to either pick on [the prosecutor] or hide something."  (Id. at 3603.)  The trial court denied the motion, stating that it "did not sense that the jury perceived [Petitioner's counsel] as obstructious [sic]."  (Id. at 3604.)  The court also commented that "all in all" the case was "well presented by both sides" and that "there was a fair trial obtained for both sides."  (Id.)

The court of appeal rejected Petitioner's judicial-misconduct claim:

> We conclude [Petitioner and Little] have not shown
> that the trial court improperly stepped into the role of
> prosecutor.   To the extent [Petitioner and Little]
> maintain the trial court's pretrial suggestion that the
> prosecutor file an amended information was improper, they
> have forfeited their contention because they raised no
> objection to it.  (People v. Monterroso (2004) 34 Cal.4th
> 743, 759; Hawkins, supra, 10 Cal.4th at p. 945.)  Even if
> we were to consider the contention, we would reject it,
> as the trial court is required to "'call attention to
> omissions in the evidence or defects in the pleadings'
> which are likely to result in a decision other than on
> the merits."  (People v. St. Andrew (1980) 101 Cal.App.3d

450, 457, quoting <u>Farrar v. Farrar</u> (1919) 41 Cal.App. 452, 457.)

To the extent [Petitioner and Little] contend the court acted as the prosecutor during the trial, we see no misconduct.  We have carefully examined the court's examination of witnesses and remarks before the jury.  In every instance, the court's questioning was impartial and tailored to clarify testimony or elicit relevant evidence; on no occasion did the court suggest any view regarding the witness's credibility.  Whenever the court limited the prosecutor's examination of a witness, it did so because the witness could not provide additional relevant evidence; moreover, the court's summaries of testimony were nonargumentative and fair.  Although the court criticized the prosecutor's presentation of the case outside the presence of the jury, its remarks before the jury were much more restrained.  In the jury's presence, the court urged the prosecutor at different points to slow down or proceed in chronological order, sporadically adding that the prosecutor's questions were confusing the witness or the jury; at other points, the court asked the prosecutor to move on.  Nowhere do we find the court's remarks exceeded its discretion "'to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions.'" (<u>People v. Snow</u> (2003) 30 Cal.4th 43, 78, quoting <u>U.S. v. Donato</u> (D.C. Cir. 1996) 99 F.3d 426, 434.)  Accordingly, the court did not stray into error by questioning witnesses or regulating the

33

1    prosecutor's examination of witnesses.

2         . . . As explained above, the trial court elicited

3    evidence from the prosecution witnesses in an impartial

4    manner, and restricted its remarks in open court to those

5    warranted by the prosecutor's conduct.  Moreover,

6    [Petitioner and Little] do not suggest that the trial

7    court impaired defense counsels' [sic] cross-examination

8    of witnesses or presentation of evidence, and our review

9    of the record discloses no such conduct.  In sum, there

10   was no judicial misconduct.

11   (Lodged Doc. 12 at 30-32 (footnote omitted).)

12        B.   Applicable Law

13        On federal habeas review of a judicial-misconduct claim, the

14   question is "whether the state trial judge's behavior rendered

15   the trial so fundamentally unfair as to violate federal due

16   process." Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995);

17   Mitchell v. Domingo, No. CV 09-7687-AG (E), 2010 WL 4628144, at

18   *7 (C.D. Cal. Oct. 29, 2010) (applying same framework under

19   AEDPA).  "[T]he floor established by the Due Process Clause

20   clearly requires a fair trial in a fair tribunal." Bracy v.

21   Gramley, 520 U.S. 899, 904 (1997) (internal quotation marks

22   omitted).  To prevail on a claim of judicial misconduct, a

23   petitioner must show "an extremely high level of interference by

24   the trial judge which creates a pervasive climate of partiality

25   and unfairness." Duckett, 67 F.3d at 740 (internal quotation

26   marks omitted).  Generally, judicial "remarks" during the course

27   of a trial that are "critical or disapproving of, or even hostile

28   to, counsel, the parties, or their cases" are insufficient to

34

1    overcome a presumption of judicial integrity.  Larson v.
2    Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) (internal
3    quotation marks omitted).
4         C.  Discussion
5         Petitioner is not entitled to habeas relief because the
6    court of appeal's rejection of his judicial-misconduct claim was
7    not objectively unreasonable.  As the court of appeal found, the
8    trial court here committed no misconduct.  The trial court made
9    it clear to the parties that its goal was to facilitate the
10   efficient presentation of evidence by eliminating unnecessary,
11   irrelevant, or confusing testimony.  (Lodged Doc. 5, 2 Rep.'s Tr.
12   at 378-79.)  To that end, the trial court's questioning, though
13   at times pointed, was impartial and did not suggest any view
14   regarding a witness's credibility.  It was also tailored to
15   clarify chronology or important details.  As such, it did not
16   create a pervasive climate of partiality.  See Basquez v. McEwen,
17   No. EDCV 10-1278-JHN RNB, 2011 WL 1045086, at *18 (C.D. Cal. Feb.
18   3, 2011) (rejecting judicial-misconduct claim under AEDPA because
19   trial court permitted to examine witnesses to clarify evidence),
20   accepted by 2011 WL 1042328 (C.D. Cal. Mar. 18, 2011).  The
21   court's summarizing of witnesses' testimony also was impartial
22   and nonargumentative.  (See, e.g., Lodged Doc. 5, 3 Rep.'s Tr. at
23   654, 676, 4 Rep.'s Tr. at 1036, 1041, 5 Rep.'s Tr. at 1261, 1338,
24   1358.)  To the extent the jury could have viewed some of the
25   trial court's actions or comments as evincing a particular view
26   of the case, the effect was mitigated by its instruction to the
27   jury at the start of trial: "Do not take anything I say or do
28   during the trial as an indication of what I think about the

                                  35

1   facts, the witnesses, or what your verdict should be." (Lodged

2   Doc. 5, 2 Rep.'s Tr. at 304-05.) As for Petitioner's argument

3   that the court's actions caused the jury to feel sorry for the

4   prosecutor and render a guilty verdict as a result (FAP at 14),

5   such speculation is insufficient to show that his trial was

6   fundamentally unfair, cf. Romano v. Oklahoma, 512 U.S. 1, 14

7   (1994) (noting that "[i]t is impossible to know" how certain

8   evidence "might have affected the jury" and that finding of

9   fundamental unfairness would "be an exercise in speculation,

10  rather than reasoned judgment").

11      Further, the trial court's remarks to the prosecutor in the

12  jury's presence were restricted only to those warranted by his

13  conduct. Whenever the court limited the prosecutor's examination

14  of a witness and told him to "move on" or "keep moving," it did

15  so because the witness could not provide additional relevant

16  evidence. (See, e.g., Lodged Doc. 5, 3 Rep.'s Tr. at 645, 650-

17  51, 655-57, 676-77, 679, 681, 694, 6 Rep.'s Tr. at 1835.) For

18  example, on several occasions, the court summarized that a

19  witness had denied signing any documents related to a particular

20  property in order to avoid the unnecessarily repetitive process

21  of letting the prosecutor show the witness every document bearing

22  his or her forged signature. (See, e.g., Lodged Doc. 5, 3 Rep.'s

23  Tr. at 656, 666, 676, 696, 4 Rep.'s Tr. at 1040, 6 Rep.'s Tr. at

24  1521.)

25      Further still, the trial court did not impair Petitioner's

26  counsel's cross-examination of witnesses or presentation of

27  evidence. Indeed, at times the trial court's questioning

28  elicited testimony favorable to Petitioner. (See, e.g., Lodged

Doc. 5, 3 Rep.'s Tr. at 702-03, 707, 4 Rep.'s Tr. at 1020-21, 7 Rep.'s Tr. at 2142.)  For example, the trial court emphasized that Najera had never met Petitioner and did not know whether the man identifying himself as "Dwight Shelton" over the phone was Petitioner.  (Lodged Doc. 5, 3 Rep.'s Tr. at 702-03, 707.)  The trial court also limited the prosecutor's cross-examination of Petitioner when the testimony would have been repetitive or irrelevant.  (See, e.g., Lodged Doc. 5, 6 Rep.'s Tr. at 1835, 1860, 1864-65, 1873.)

Viewed in light of the entire record, the trial court's actions and comments did not create a pervasive climate of partiality or unfairness.  See Duckett, 67 F.3d at 740.  On the contrary, they aided in eliciting the truth and facilitated a fair trial for Petitioner.  Absent evidence of an extrajudicial source of bias or partiality, the record is insufficient to overcome the presumption of judicial integrity.  Larson, 515 F.3d at 1067.

For all these reasons, the court of appeal was not objectively unreasonable in rejecting Petitioner's judicial-misconduct claim.  Thus, Petitioner is not entitled to habeas relief on this basis.

**II.  Petitioner's Evidentiary Claim Does Not Warrant Habeas Relief**

In ground two, Petitioner claims that the trial court erroneously admitted evidence that he possessed false identification cards when he was arrested, thereby violating his right to due process.  (FAP at 5, 20-24; Traverse at 8-10.)  He bases his argument mainly on California Evidence Code sections

37

1  1101 and 352.  (See FAP at 21-23.)

2       A.   Relevant Background

3       Before trial, the prosecutor informed the court that he

4  intended to introduce evidence that Petitioner possessed false

5  identification cards when he was arrested.  (Lodged Doc. 5, 2

6  Rep.'s Tr. at 14.)  None of the cards were in names used in the

7  charged transactions.  (Id. at 15.)  The prosecutor argued that

8  the evidence was nonetheless admissible to show flight and

9  consciousness of guilt.  (Id. at 14.)  Petitioner's counsel

10 objected, arguing that it was inadmissible character evidence and

11 more prejudicial than probative.  (Id. at 14-15.)  The trial

12 court ruled that the evidence was admissible, finding that the

13 cards showed "a willingness" to engage in identity theft and

14 "[went] to issues related to the case."  (Id. at 15-16.)

15      The prosecutor presented the evidence during his cross-

16 examination of Petitioner.  (Lodged Doc. 5, 6 Rep.'s Tr. at

17 1870.)  Petitioner acknowledged that the identification cards

18 were false but denied that he had them in his car when he was

19 arrested or that he ever possessed "fake I.D.'s" in anyone else's

20 name.  (Id. at 1869-73.)[5]

21      The court of appeal rejected Petitioner's evidentiary-error

22

23      [5] After Petitioner testified, outside the jury's presence, the
   prosecutor informed the court that he would obtain and substitute
24 a clearer photocopy of the document containing images of the false
   identification cards.  (Lodged Doc. 5, 6 Rep.'s Tr. at 1877-78.)
25 The new copy was different from the first in that it also showed a
   certified image of Petitioner's Department of Motor Vehicles
26 photograph.   (Lodged  Doc.  5,  7  Rep.'s  Tr.  at  2105-06.)
   Petitioner's counsel objected to the admission of the substitute
27 copy on foundational grounds.  (Id. at 2106-07.)  The trial court
   admitted the evidence.  (Id. at 2119.)

28

claim:

To begin, the evidence was admissible to show the elements of conspiracy. As explained in Cooks, supra, 141 Cal.App.3d at pages 313 to 314, "[t]he settled law is . . . that in a prosecution for conspiracy, evidence of uncharged crimes may be admissible as proof of the common design or plan of the conspiracy. [Citations.] Or, as is also said, evidence of uncharged crimes may be admissible to prove that the charged (substantive) crimes were committed as part of a conspiracy to commit other crimes. [Citations.] In contrast to cases where evidence of uncharged crimes committed by the defendants is offered to prove, by inference, an element of the substantive (charged) crime, such as intent or identity (modus operandi) [citations], in a conspiracy case[,] uncharged crimes may be direct proof of an essential element of the crime of conspiracy itself, namely, overt acts in furtherance of the conspiracy [citation.]" (Fn. omitted.)

In Cooks, the defendants were charged with several crimes, including conspiracy to commit murder. (Cooks, supra, 141 Cal.App.3d at pp. 242-243.) At trial, the prosecution was permitted to submit evidence that the defendants had attempted to kidnap three children, even though this crime was neither charged against the defendants nor expressly alleged as an overt act related to the conspiracy. (Id. at pp. 242-243, 251-257, 314-315.) The appellate court concluded that the

evidence was properly admitted under Evidence Code section 1101, subdivision (b), to show an overt act in furtherance of the conspiracy. (Cooks, at p. 314.) We reach the same conclusion here, as the false identification cards and driver's licenses showed that [Petitioner and Little] were prepared to engage in fraudulent transactions.

In addition, the evidence was admissible to show [Petitioner's and Little's] intent regarding the charges of identity theft, forgery, and other fraud-related crimes. In connection with such crimes, evidence that a defendant has participated in similar but uncharged conduct is admissible under Evidence Code section 1101, subdivision (b), to establish intent to defraud. . . .

[Petitioner and Little] also contend the evidence was inadmissible under Evidence Code section 352 as more prejudicial than probative. We disagree. "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (People v. Karis (1988) 46 Cal.3d 612, 638, quoting People v. Yu (1983) 143 Cal.App.3d 358, 377.) As explained above, the evidence of the false identification cards and driver's licenses was probative of the existence of a conspiracy to engage in fraudulent real estate transactions, as well as [Petitioner's and Little's] intent in committing the underlying fraud-related crimes. Accordingly, the trial

40

1   court did not err in admitting the evidence under

2   Evidence Code section 352.

3   (Lodged Doc. 12 at 33-35.)

4       B.   <u>Applicable Law</u>

5       When a petitioner asserts a due process violation based on

6   admission of evidence, a federal habeas court is limited to

7   determining whether the challenged evidence "rendered the trial

8   so fundamentally unfair as to violate due process." <u>Windham v.</u>

9   <u>Merkle</u>, 163 F.3d 1092, 1103 (9th Cir. 1998); <u>accord</u> <u>Larson</u>, 515

10  F.3d at 1065.  But "[u]nder AEDPA, even clearly erroneous

11  admissions of evidence that render a trial fundamentally unfair

12  may not permit the grant of federal habeas corpus relief if not

13  forbidden by 'clearly established Federal law,' as laid out by

14  the Supreme Court." <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101

15  (9th Cir. 2009) (citing 28 U.S.C. § 2254(d)).  For example, the

16  Supreme Court "has never expressly held that it violates due

17  process to admit other crimes evidence for the purpose of showing

18  conduct in conformity therewith." <u>Garceau v. Woodford</u>, 275 F.3d

19  769, 774 (9th Cir. 2001), <u>overruled on other grounds by</u> 538 U.S.

20  202 (2003).

21      C.   <u>Discussion</u>

22      The court of appeal's rejection of Petitioner's evidentiary

23  claim was not objectively unreasonable.  The court found as a

24  matter of state law that the trial court properly admitted the

25  evidence of false identification on two separate bases.  <u>See</u>

26  <u>Hubbart v. Knapp</u>, 379 F.3d 773, 780 (9th Cir. 2004) (Habeas

27  courts "may not second-guess the California appellate court's

28  construction of its own state law.").  The evidence was

41

1  admissible not only to prove the overt-act element of conspiracy
2  but also to prove intent to defraud, which was an element of
3  identity theft, forgery, and other fraud-related crimes.  Because
4  the other-crimes evidence was admitted for purposes other than to
5  show conduct in conformity therewith, there was no due-process
6  violation.  See Spencer v. Texas, 385 U.S. 554, 560-61 (1967);
7  Garceau, 275 F.3d at 774.

8      Even if the evidence was admitted to show conduct in
9  conformity with other crimes, its admission did not render
10  Petitioner's trial so fundamentally unfair as to violate due
11  process.  See Larson, 515 F.3d at 1065 (noting that on federal
12  habeas review, question is not whether trial court's evidentiary
13  ruling was erroneous under state law but whether its failure to
14  exclude evidence rendered trial fundamentally unfair).  The
15  evidence that Petitioner possessed false identification cards
16  when he was arrested played a minimal role at trial.  It was not
17  presented to the jury during the prosecution's case-in-chief;
18  rather, it was presented only during the defense case, during the
19  prosecutor's cross-examination of Petitioner.  (Lodged Doc. 5, 6
20  Rep.'s Tr. at 1869-73.)  Petitioner repeatedly denied that he
21  possessed the cards (id.), and the trial court prohibited the
22  prosecutor from questioning Detective Zaun regarding their source
23  (Lodged Doc. 5, 7 Rep.'s Tr. at 2142), further diluting any
24  effect of the evidence on the jury.  Although the prosecutor
25  referred to the cards during closing argument, his discussion was
26  brief relative to the total time of his argument.  (Lodged Doc.
27  5, 7 Rep.'s Tr. 2167-68 (less than a page of 58 pages of
28  reporter's transcript).)  Thus, even if the evidence was

erroneously admitted under state law, it did not render the trial so fundamentally unfair as to violate due process.

For all these reasons, the state court was not objectively unreasonable in rejecting Petitioner's evidentiary claim.   Thus, Petitioner is not entitled to habeas relief on this basis.

**III.  Petitioner's Sentencing Claim Does Not Warrant Habeas Relief**

In ground three of the FAP, Petitioner alleges that his sentence violated California Penal Code section 654's prohibition against multiple punishments.   (FAP at 6, 24-25.)[6]   The heading of the claim states only that "The Trial Court Erred in Failing to Stay Additional Counts Pursuant to Penal Code Section 654," and he nowhere mentions any federal basis for the claim.   In response to Respondent's argument that the claim is not cognizable on federal habeas review, Petitioner tries in the Traverse to federalize it by claiming that his sentence "violat[ed] [his] due process rights and double-jeopardy." (Traverse at 2.)   But new habeas claims cannot be raised for the first time in reply.   See Delgadillo v. Woodford, 527 F.3d 919, 930 n.4 (9th Cir. 2008) (holding that reply not proper pleading to raise additional grounds for relief or amend petition); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (same).   Moreover, any such claim has not been exhausted in state court.   Accordingly, Petitioner's sentencing claim is not cognizable on federal habeas review.   See Watts v. Bonneville, 879 F.2d 685, 687 (9th Cir. 1989) (rejecting as not cognizable claim that multiple sentences for single act violated section

---

[6] The FAP appears to be missing page 26.

43

654); <u>Cacoperdo</u>, 37 F.3d at 507 (rejecting due-process challenge to imposition of consecutive sentences, stating that "decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus").

**IV. Petitioner's Request for an Evidentiary Hearing Is Denied**

Petitioner seeks an evidentiary hearing.  (Traverse at 3.) But an evidentiary hearing is not required on issues that can be resolved by reference to the state-court record under § 2254(d), as all of Petitioner's claims can be.  <u>Cullen v. Pinholster</u>, 131 S. Ct. 1388, 1399 (2011) ("[W]hen the state-court record precludes habeas relief under the limitations of § 2254(d), a district court is not required to hold an evidentiary hearing." (internal quotation marks omitted)).  Thus, his request for an evidentiary hearing is denied.

**ORDER**

IT THEREFORE IS ORDERED that the FAP is denied, Petitioner's request for an evidentiary hearing is denied, and Judgment be entered dismissing this action with prejudice.

DATED: <u>January 30, 2015</u>

JEAN ROSENBLUTH
U.S. MAGISTRATE JUDGE

44
